American Bankers Insurance Company of Florida ("American Bankers"), the defendant in a pending action, moved to compel arbitration. The trial court denied the motion. American Banker appealed.[1] We reverse and remand.
 FACTS AND PROCEDURAL HISTORY
Norman Crawford financed the purchase of his home with a loan from Chemical Mortgage Company. His promissory note to Chemical included a requirement that he obtain insurance on the property. On September 27, 1995, Chemical sent Crawford a letter asking for documentation to show that he had insured his home. In that letter, Chemical wrote:
"Dear Mortgage Customer:
 "A review of our file reveals that we do not have a current insurance policy for your property. If you have insurance, please advise your agent to send [us] a copy of your policy. . . . *Page 1127 
 "We are required by the investor of your mortgage to have continuous evidence of insurance for your property. Because we do not have evidence of continuous insurance coverage, we have obtained temporary coverage to protect your property. When we receive evidence of insurance from you or your agent, we will cancel this temporary coverage back to the effective date of your policy and send a confirmation letter. Your escrow account will not be billed provided you can provide us with continuous evidence of coverage.
 "If we do not receive from you or your agent a policy or reinstatement notice, permanent insurance coverage for one (1) year will be issued and mailed to you. The premium for this coverage will be billed to your escrow account."
Because Crawford had failed to provide the documentation requested, Chemical sent Crawford a reminder letter, dated October 27, 1995, which stated in part:
"Dear Mortgage Customer:
 "Recently, we notified you that we do not have a valid insurance policy for your property. We have yet to receive evidence of coverage from you or your agent. If you have insurance, please advise your agent to send [us] a copy of your policy. . . .
 "Please contact your agent today and have a policy or reinstatement notice sent to us identifying our loan number. If we do not receive either a policy or a reinstatement notice, hazard insurance will be issued and your escrow account charged."
Crawford failed to respond, and Chemical instructed American Bankers to issue a policy of insurance covering Crawford's property for a one-year term. American Bankers did so, and it sent Crawford a letter explaining that it had issued a policy of insurance on his property and that he would be responsible for paying the premiums. That letter also stated:
 "If, upon your review, you find that the new policy is not adequate for your needs, contact your agent to secure a new policy that would be acceptable to your mortgage company."
Crawford did not do as the letter suggested.
In December 1995, American Bankers sought the approval of the Alabama Department of Insurance to include arbitration provisions in its policies issued in Alabama. The Department approved the application in January 1996.
In June 1996, in anticipation of the August 1996 expiration of Crawford's policy, American Bankers sent him a package of renewal materials. It appears undisputed that the package included a renewal declaration form offering to renew Crawford's policy for an additional one-year term at a rate of $923. In also appears undisputed that a policy jacket was included with the declaration form and that the jacket stated:
 "THIS POLICY JACKET WITH DECLARATIONS PAGE AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF COMPLETES YOUR HOMEGARD POLICY."
Further, the jacket provided:
 "You may cancel this policy by returning it to us or by advising us in writing when at a future date the cancellation is to be effective."
American Bankers also enclosed an arbitration endorsement form with the policy jacket and renewal declaration form. The arbitration form stated, in part:
"ARBITRATION CLAUSE ENDORSEMENT
 "It is understood and agreed that the policy is qualified with respect to the following:
 "ANY AND ALL DISPUTES, CONTROVERSIES OR CLAIMS OF ANY KIND AND NATURE BETWEEN THE POLICYHOLDER(S) AND THE INSURER ARISING OUT OF OR IN ANY WAY RELATED TO THE VALIDITY, INTERPRETATION, PERFORMANCE *Page 1128 
OR BREACH OF ANY PROVISION OF THIS POLICY, AND UPON WHICH A SETTLEMENT HAS NOT BEEN REACHED BY THE POLICYHOLDER(S) AND THE INSURER, SHALL BE RESOLVED, EXCLUSIVELY, BY ARBITRATION IN ACCORDANCE WITH THE FEDERAL ARBITRATION ACT (9 U.S.C SECTION 1 ET SEQ.)."
(Capitalization in the original.) The arbitration endorsement was also listed at the bottom of the renewal declaration page.
In his brief, Crawford asserts that he "took no action to renew the insurance." However, it appears undisputed that he paid the $923 renewal fee. At the end of the second one-year term of insurance coverage, Crawford again renewed his policy by paying the renewal premium.
Crawford later sued, alleging that American Bankers had improperly charged him for insurance coverage that he did not authorize and that he had never agreed to purchase. American Bankers moved to compel arbitration under the provisions of the arbitration endorsement. The trial court held that Crawford had not voluntarily agreed to arbitration. Alternatively, the trial court held that even if Crawford had agreed to arbitration, Alabama's anti-arbitration statute, § 8-1-41(3), Ala. Code 1975, "reverse-preempts" the Federal Arbitration Act, under the provisions of the McCarran-Ferguson Act, 15 U.S.C. § 1011 et seq., because, the court held, § 8-1-41(3) is incorporated into the law of insurance by § 27-14-22, Ala. Code 1975. Based on these reasons, the trial court denied American Bankers' motion to compel arbitration.
 DISCUSSION
This appeal presents two basic questions:
 (1) Whether the trial court erred in holding that Crawford did not agree to arbitrate; and
 (2) Whether the trial court erred in holding that, even if Crawford did agree to arbitrate, the arbitration clause is unenforceable, on the basis that under the McCarran-Ferguson Act the Alabama "anti-arbitration statute" (§ 8-1-41(3), Ala. Code 1975) "reverse-preempts" the Federal Arbitration Act.
Before addressing these questions, we note that our review in a case such as this is de novo. Patrick Home Center, Inc. v. Karr,730 So.2d 1171 (Ala. 1999).
 I.
We first consider American Bankers' argument that the trial court erred in holding that Crawford had never agreed to arbitration and that American Bankers was therefore not entitled to an order compelling arbitration. The trial court held:
 "The insurance policy containing the arbitration clause was not voluntarily purchased by the Plaintiff; it was force-placed on his home. Plaintiff did not read this policy prior to the insurance being placed on his home, and, in fact, only saw these documents after the insurance was force-placed. Plaintiff therefore made no knowing, willing, and voluntary waiver of his right to trial by jury as guaranteed by the United States Constitution and the Constitution of Alabama."
In a similar vein, Crawford alleges that the first policy he was issued did not include an arbitration provision; that he did not understand what arbitration entailed; that in a telephone conversation an employee of American Bankers misrepresented to him the implications of an arbitration agreement; and that he never signed any document including an arbitration provision. Crawford argues that these factors require the conclusion that he did not "knowingly, willingly, and voluntarily" waive his right to a jury trial.
Section 2 of the Federal Arbitration Act, 9 U.S.C. § 1 et seq. (the "FAA"), provides that arbitration agreements in contracts involving interstate commerce *Page 1129 
are binding.[2] Further, the United States Supreme Court has held:
 "Section 2 of the FAA provides that written arbitration agreements `shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for revocation of any contract.' 9 U.S.C. § 2. Repeating our observation in [Perry v. Thomas, 482 U.S. 483 (1987)], the text of § 2 declares that state law may be applied `if that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally.' 482 U.S., at 492, n. 9."
Doctor's Associates, Inc. v. Casarotto, 517 U.S. 681, 686-87
(1996) (emphasis added in Casarotto omitted here). Similarly, the Supreme Court has held that arbitration provisions in contracts must be reviewed by state courts "on the same footing as a contract's other terms."Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 275
(1995), quoting Scherk v. Alberto-Culver Co., 417 U.S. 506,511 (1974) (internal quotation marks omitted). The Supreme Court wrote:
 "[Section] 2 gives States a method for protecting consumers against unfair pressure to agree to a contract with an unwanted arbitration provision. States may regulate contracts, including arbitration clauses, under general contract law principles and they may invalidate an arbitration clause `upon such grounds as exist at law or in equity for the revocation of any contract.' 9 U.S.C. § 2
[emphasis added in Dobson]. What states may not do is decide that a contract is fair enough to enforce all its basic terms (price, service, credit), but not fair enough to enforce its arbitration clause. The Act makes any such state policy unlawful, for that kind of policy would place arbitration clauses on an unequal `footing,' directly contrary to the Act's language and Congress' intent."
Dobson, 513 U.S. at 281.
Decisions of the Supreme Court, of course, are binding on this Court.Martin v. Hunter's Lessee, 14 U.S. 304 (1 Wheat.) (1816). Thus, this Court, and all the other courts of this State, are required faithfully to follow and to apply the decisions of the Supreme Court of the United States. With regard to arbitration provisions, the Supreme Court has made it clear that those provisions may be denied application only for reasons that could make other provisions of a contract inapplicable.
American Bankers argues that this Court's recent opinion in Ex parteRager, 712 So.2d 333 (Ala. 1998), controls. In that case, Jonathan Blake Rager applied for an insurance policy with Liberty National Life Insurance Company ("Liberty National"). Rager, 712 So.2d at 334. The application Rager signed did not include an arbitration provision. Rager, 712 So.2d at 335. However, Liberty National mailed Rager a copy of his policy and attached an endorsement that included an arbitration clause. Id. This Court wrote:
 "An unsigned endorsement is valid if it is attached to the policy and is referenced therein. See Greene v. Hanover Insurance Co., 700 So.2d 1354 (Ala. 1997). It is undisputed that the endorsement containing the arbitration clause was attached to the policy from the outset. Also, the policy contains the following clause referring to the endorsement: `This policy with any attached papers is the entire contract between you and the Company.' Therefore, we hold that the endorsement is a valid part of the policy and must be enforced.
 "Also, the policy that Liberty National issued included this clause allowing Rager 10 days to cancel the policy, with no cost, if he did not approve of its terms: *Page 1130 
`Please examine your policy carefully. Within ten days after this policy is first received, it may be returned to us or the agent through whom it was purchased. If returned, the policy will be as though it had never been issued. Any premiums paid will be returned.' If Rager did not approve of the arbitration clause found in the policy, he should have objected within the 10 days allowed. The objection to the arbitration clause is untimely. Liberty National gave Rager ample time to examine the policy. By not returning the policy, he agreed to its terms.
 "The plaintiffs' argument that the application should have mentioned arbitration is also without merit. Many parts of an insurance policy are not mentioned in the application. If we accepted this argument, then any part of an insurance policy that was not specifically mentioned in the application would be automatically invalid, even if the insured did not object within the time permitted. Such a result would be inequitable to the insurance company.
 "`An application for insurance is an offer to enter into an insurance contract, and if the insurer issues a policy materially different from that applied for, the policy is a counteroffer which becomes binding only when accepted by the applicant.' Connell v. State Farm Mutual Auto. Ins. Co., 482 So.2d 1165, 1167 (Ala. 1985). Even if the inclusion of the arbitration provision was a material alteration of the policy applied for — and we would say it was not — the petitioners would have accepted the counter-offer by not returning the policy and, instead, paying the premiums on it. Therefore, it does not matter that the application did not mention arbitration."
Rager, 712 So.2d at 335-36.
The facts of this case are similar to the facts of Rager. As inRager, the insurer included the arbitration clause endorsement with the renewal policies it sent to its insured. Also, as in Rager, the renewal policies expressly incorporated endorsements. Further, in both cases the policyholder had time to review the policy and the attached arbitration provision and to cancel the policy if he found it objectionable. Finally, in both cases the policyholder paid his premiums without objecting to the arbitration provision. Given the factual similarities of these two cases, we conclude that the reasoning this Court applied in Rager
also applies here, and we hold that Crawford's payment of his renewal premiums in 1996 and in 1997 amounted to an acceptance of American Bankers' offer to insure his property under the terms in the policy, including the arbitration provision.
 II.
American Bankers also argues that the trial court erred in holding that Alabama's anti-arbitration statute, § 8-1-41(3), Ala. Code 1975, "reverse-preempts" the Federal Arbitration Act, under the provisions of the McCarran-Ferguson Act. The trial court held:
 "The Federal Arbitration Act does not apply to this contract. The McCarran-Ferguson Act, 15 U.S.C. § 1011, provides in part, `The Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest. . . .' Section 1012(b) of the Act provides, `No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance.' This Act has been interpreted by the federal judiciary to preclude `application of federal laws if, as a result, laws of a state regulating insurance would be invalidated, impaired, or superseded.' Miller v. National Fidelity Life Ins. Co., 588 F.2d 185, 186-187 (5th Cir. 1979).
 "Section 8-1-41(3) Ala. Code 1975, provides that an agreement to submit an *Page 1131 
agreement to arbitration cannot be specifically enforced. This statute is incorporated into the Alabama Insurance Code by way of § 27-14-22, Ala. Code 1975: `All contracts of insurance, the application for which is taken within this state, shall be deemed to have been made within this state and subject to the laws thereof.'
 "There is no question that the Federal Arbitration Act does not specifically relate to the business of insurance, and it is clear that the FAA directly invalidates, impairs, and supersedes the above-referenced Alabama statutes governing insurance contracts in this state. Because of this direct and obvious conflict, the McCarran-Ferguson Act is applicable to the case presently before this Court and preempts the FAA.
 "Based on the McCarran-Ferguson Act, the motion to compel arbitration is DENIED."
Because a resolution of this case requires a determination of the effect of the interaction of several sections of the Alabama Code of 1975 and of the United States Code, we begin our analysis by setting out the relevant portions of those Code sections. Section 8-1-41, Ala. Code 1975, reads, in part:
 "§ 8-1-41. Obligations which cannot be specifically enforced.
 "The following obligations cannot be specifically enforced:
". . . .
 "(3) An agreement to submit a controversy to arbitration."
We note that § 8-1-41 is part of Chapter 1 of Title 8 of the Alabama Code of 1975 and that that chapter deals generally with contracts. No subsection of § 8-1-41 specifically mentions insurance.
Crawford argues, however, that § 8-1-41(3), the "anti-arbitration statute," is incorporated into the law of insurance by § 27-14-22, Ala. Code 1975, which provides:
 "All contracts of insurance, the application for which is taken within this state, shall be deemed to have been made within this state and subject to the laws thereof."
The significance of this Code section, according to Crawford, is that it incorporates § 8-1-41(3) into the law of insurance sufficiently to trigger the reverse-preemption provisions of the McCarran-Ferguson Act, 15 U.S.C. § 1012, which provides, in part:
"(a) State Regulation
 "The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.
"(b) Federal Regulation
 "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance. . . ."
In United States Department of the Treasury v. Fabe,508 U.S. 491, 500 (1993), the United States Supreme Court established the analytical framework to be applied in determining whether the McCarran- Ferguson Act's reverse-preemption provision applies to bar the application of a federal law. The Court held that reverse preemption occurs under the McCarran-Ferguson Act if: (1) the federal statute at issue does not "specifically relate to the business of insurance"; (2) the state statute was "enacted `for the purpose of regulating the business of insurance'"; and (3) application of the federal statute "`invalidate[s], impair[s], or supersede[s]'" the state statute. Fabe,508 U.S. at 500-01. For reverse preemption to occur, each of these three factors must be present.
It appears undisputed that the Federal Arbitration Act does not "specifically relate *Page 1132 
to the business of insurance." Thus, we conclude that the first factor is present, and we turn our attention to the two other factors.
The main point of contention between the parties involves the second factor in the Fabe test. The parties dispute whether the state statute in question was "enacted for the purpose of regulating the business of insurance," and it appears that the parties disagree as to whether that factor must apply to § 8-1-41(3) or to § 27-14-22.
Crawford cites Friday v. Trinity Universal of Kansas,262 Kan. 347, 939 P.2d 869 (1997), and argues that "[t]he same analysis used by the Kansas Supreme Court in Friday should be applied to the present case." Brief of Appellee at 19. Friday, however, is distinguishable. The second factor of the Fabe test is that the state statute was "enacted for the purpose of regulating the business of insurance." In Friday, in contrast to the situation presented here, the Kansas Supreme Court considered a statutory provision that explicitly refers to the arbitrability of disputes arising from contracts of insurance. The Kansas Supreme Court wrote:
 "[Kansas Statutes Annotated § 5-401(b)] provides that a written contract may provide for arbitration of future controversies between the parties and that such a provision is `valid, enforceable, and irrevocable, except upon such grounds as exist at law or in equity for the revocation of any contract.' The provision in question, 5-401(c)(1), states: `The provisions of subsection (b) shall not apply to: (1) Contracts of insurance.'"
Friday, 262 Kan. at 349, 939 P.2d at 871 (emphasis added). Because the statute at issue in Friday explicitly mentioned insurance, and because § 8-1-41(3) does not, Friday is distinguishable. In addition, see Mutual Reinsurance Bureau v.Great Plains Mut. Ins. Co., 969 F.2d 931, 934 (10th Cir. 1992), cert. denied, 506 U.S. 1001 (1992) (the United States Court of Appeals for the Tenth Circuit held that K.S.A. § 5-401 "expressly excludes contracts of insurance from arbitration"); see also, e.g.,Stephens v. American Int'l Ins. Co., 66 F.3d 41 (2d Cir. 1995) (Kentucky statute explicitly prohibiting an insurance liquidator from being compelled to arbitrate disputes concerning delinquency proceedings was one "enacted `for the purpose of regulating the business of insurance'"); and Quackenbush v. Allstate Ins. Co.,121 F.3d 1372 (9th Cir. 1997) (California statute similar to the Kentucky statute at issue in Stephens led to a conclusion similar to that in Stephens).
To determine whether a particular statute was "enacted for the purpose of regulating the business of insurance," as that phrase is used in the McCarran-Ferguson Act, the United States Supreme Court has provided three guidelines. In Union Labor Life Ins. Co. v. Pireno, 458 U.S. 119,129 (1982), the Supreme Court wrote that a court faced with this question must determine:
 "[F]irst, whether the [state statute] has the effect of transferring or spreading a policyholder's risk; second, whether the [statute] is an integral part of the policy relationship between the insurer and the insured; and third, whether the [effects of the statute are] limited to entities within the insurance industry."
In Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41 (1987), the Supreme Court considered whether Mississippi's law of bad faith "regulates insurance" in the context of an ERISA case. Under ERISA, the Court wrote, "If a state law `relate[s] to . . . employee benefit plan[s],' it is pre- empted. [However, a] savings clause [in ERISA] excepts from the pre-emption clause laws that `regulat[e] insurance.'" 481 U.S. at 45. The ERISA savings clause and the McCarran-Ferguson reverse-preemption provision are analogous, and the Supreme Court applied the McCarran-Ferguson factors to assist in its determination whether Mississippi bad-faith *Page 1133 
law regulated insurance. The Court reasoned:
 "[T]he McCarran-Ferguson Act factors [do not] support the assertion that the Mississippi law of bad faith `regulates insurance.' . . . [T]he Mississippi common law of bad faith does not effect a spreading of policyholder risk. The state common law of bad faith may be said to concern `the policy relationship between the insurer and the insured.' The connection to the insurer-insured relationship is attenuated at best, however. . . . [T]he common law of bad faith does not define the terms of the relationship between the insurer and the insured; it declares only that, whatever terms have been agreed upon in the insurance contract, a breach of that contract may in certain circumstances allow the policyholder to obtain punitive damages. The state common law of bad faith is therefore no more `integral' to the insurer-insured relationship than any State's general contract law is integral to a contract made in that State. Finally, as we have just noted, Mississippi's law of bad faith, even if associated with the insurance industry, has developed from general principles of tort and contract law available in any Mississippi breach of contract case. . . . Accordingly, the Mississippi common law of bad faith at most meets one of the three criteria used to identify the `business of insurance' under the McCarran-Ferguson Act. . . ."
Pilot Life, 481 U.S. at 50-51.
As a preliminary matter, we note that a plain reading of § 8-1-41
(3) does not reveal any explicit connection with insurance. Turning to an application of the three Pireno guidelines, considered in light of the Supreme Court's example in Pilot Life, we conclude that § 8-1-41(3) was not "enacted for the purpose of regulating the business of insurance." First, the general anti-arbitration statute does not have the effect of "transferring or spreading a policyholder's risk." Second, although § 8-1-41(3) does impact the relationship between the insurer and the insured, in that it governs the method of resolving disputes that arise between them, the impact is attenuated, as was the impact of the statute in Pilot Life. The general anti-arbitration statute has no bearing on the more essential aspects of the insurer-insured relationship. Stated differently, the anti- arbitration statute has no bearing on the scope of the insurance coverage, the term of the policy, the price of the coverage, etc. The general anti- arbitration statute is, as the Supreme Court said of the Mississippi statute in Pilot Life, "no more `integral' to the insurer- insured relationship than any State's general contract law is integral to a contract made in that State." Pilot Life, 481 U.S. at 51. Finally, the application of the anti-arbitration statute is not "limited to entities within the insurance industry." Pireno,458 U.S. at 129. Under the Pireno guidelines, then, it appears the anti- arbitration statute is not one "enacted for the purpose of regulating the business of insurance."
In addition to the Pireno test, the Supreme Court has implied that another layer of analysis should be applied to determine whether a statute is one "enacted for the purpose of regulating the business of insurance." In Fabe, 508 U.S. at 501, the Court held that, in addition to considering the Pireno guidelines, a court should also consider the Supreme Court's prior definition of the phrase "regulating the business of insurance":
 "`Statutes aimed at protecting or regulating [the relationship between insurer and insured], directly or indirectly, are laws regulating the "business of insurance'" within the meaning of the phrase. SEC v. National Securities, Inc., 393 U.S. 453, 460 (1969)."
We believe that applying that definition leads to the same conclusion that we have reached above in applying the three Pireno guidelines. InFabe, the Court applied *Page 1134 
that definition in the context of an Ohio statute that explicitly dealt with insurance by "empower[ing] the State's Superintendent of Insurance to place a financially impaired insurance company under his supervision, or into rehabilitation, or into liquidation."Fabe, 508 U.S. at 494. In this case, in contrast with Fabe, we cannot conclude that § 8-1-41(3) is "aimed at" the insurer-insured relationship. We are presented with no argument that the Legislature was "aiming at" that relationship when it passed the bill that was later codified as § 8-1-41(3). That Code section, instead, is one that applies to all Alabama contracts.
The conclusion we reach on this issue is consistent with decisions we have reviewed from several other courts in cases similar to this one. Those courts have concluded that statutes of general applicability do not satisfy the McCarran-Ferguson requirement that for a state statute to reverse- preempt the FAA the state statute must have been enacted for the purpose of regulating the business of insurance. For example, in Hamilton LifeIns. Co. of New York v. Republic National Life Ins. Co., 408 F.2d 606,611 (2d Cir. 1969), the United States Court of Appeals for the Second Circuit held:
 "To avail itself of the McCarran Act, then, appellant must show that the application of the Federal Arbitration Act would `invalidate, impair or supersede any law enacted by any State for the purpose of regulating the business of insurance.' 15 U.S.C. § 1012(b).
 "It is quite plain that arbitration statutes, including those of Texas and New York, are not statutes regulating the business of insurance, but statutes regulating the method of handling contract disputes generally."
Similarly, in Hart v. Orion Ins. Co., 453 F.2d 1358, 1360 (10th Cir. 1971), the Tenth Circuit similarly held:
 "None of the provisions of the Montana, Illinois, and Colorado statutes to which our attention has been called regulate the business of insurance. Instead, they are laws of general application pertaining to the method of handling contract disputes. [Citing Hamilton Life Ins. Co., 408 F.2d at 611.] Accordingly, the McCarran-Ferguson Act does not bar the application of the Federal Arbitration Act and the arbitration provisions are enforceable in the case at bar."
See also Miller v. National Fidelity Life Ins. Co., 588 F.2d 185
(5th Cir. 1979), in which the old Fifth Circuit held that no law in the Georgia insurance code would be impaired by the Federal Arbitration Act and, therefore, that the McCarran-Ferguson Act did not allow reverse preemption.
We also note that at least one federal district court has considered the very same issues and arguments that are presented in this case and, applying Alabama law, that court reached the same conclusion we reach today. See Clayton v. Woodmen of the World Life Ins. Society,981 F. Supp. 1447 (M.D. Ala. 1997), and Woodmen of the World Life Ins.Society v. White, 35 F. Supp.2d 1349 (M.D. Ala. 1999). In White, Judge Harold Albritton held:
 "This court . . . concludes that because Alabama's statute which states that agreements to arbitrate are unenforceable is a general statute not found in the insurance code, but instead found in Alabama's general contract law and directed at entities other than insurance companies, it is not a statute which regulates insurance within the meaning of McCarran-Ferguson. See Hart v. Orion Ins. Co., 453 F.2d 1358, 1360 (10th Cir. 1971) (statutes do not regulate the business of insurance if they are laws of general application pertaining to the method of handling contract disputes); Hamilton Life Ins. Co. of New York v. Republic National Life Ins. Co., 408 F.2d 606
(2d Cir. 1969) (statutes regulating the method of handling contract disputes are not statutes regulating the business of insurance)."
White, 35 F. Supp.2d at 1356.
Based on the foregoing analysis, we conclude that § 8-1-41(3) was not "enacted *Page 1135 
for the purpose of regulating the business of insurance." Given that conclusion, we need not consider the third factor of theFabe test, but we must address the effect § 27-14-22, Ala. Code 1975, has on this analysis.
The plaintiff argues that § 27-14-22 incorporates § 8-1-41(3) into the law of insurance. Further, he argues that if the FAA prevents the anti-arbitration provision of § 8-1-41(3) from being enforced, then the FAA would impair § 27-14-22 to the extent it incorporates § 8-1-41(3) into the law of insurance. Judge Albritton considered this issue in White:
 "The Defendants have also cited to a separate provision of the Alabama Code, § 27-14-22, which governs the applicability of general law to the insurance code. . . . The Defendants appear to argue first that this statute shows that the anti-arbitration provision was intended to apply to contracts for insurance. Another district court analyzing an incorporation argument, for purposes of applying McCarran-Ferguson within the context of an ERISA case, noted that the fact that the insurance code was incorporated into a statute of general application did not mean that McCarran-Ferguson applied, because, among other reasons, the law of general application applied to entities other than insurance entities. McManus v. Travelers Health Network of Texas, 742 F. Supp. 377
(W.D. Tex. 1990).
 "The Defendants also argue that enforcement of arbitration clauses will violate this specific statutory provision because it says that insurance contracts are to be governed by the laws of the state. Woodmen [of the World] responds [by arguing] that this statute is merely a conflict of law statute, and has no bearing on whether arbitration clauses may be enforced.
 "The court has been cited to no cases in which this limited type of incorporation statute was considered to be violated or [superseded] under McCarran-Ferguson by enforcement of an arbitration provision. This incorporation statute is not a provision in which the statute governing arbitration specifically exempted insurance contracts. `When the overwhelming public policy in favor of arbitration is [weighed] against the speculative infringement upon . . . insurance laws . . .' the balance clearly favors compelling arbitration. Life of America Ins. Co. v. Aetna Life Ins. Co., 744 F.2d 409, 413 (5th Cir. 1984)."
White, 35 F. Supp.2d at 1356.
Two amici curiae, the American Council of Life Insurance and American General Life and Accident Insurance Company, argue that § 27-14-22
is simply a choice-of-law provision and, as such, cannot be used to "bootstrap" § 8-1-41(3) into the status of an insurance statute. American Bankers argues that even if § 27-14-22 does incorporate § 8-1-41(3) into insurance law it cannot alter the essential character of § 8-1-41(3). In other words, in American Bankers' view, the application of § 27-14-22 cannot change the fact that § 8-1-41(3) is an act generally applicable to all Alabama contracts and the applicability of § 27-14-22 has no effect upon the analysis of the three Pireno guidelines and the conclusion, discussed above, that § 8-1-41(3), or § 8-1-41(3) as incorporated by § 27-14-22, is not a statute "enacted for the purpose of regulating the business of insurance."
We find the arguments of amici curiae to be persuasive. Our research reveals only two recent cases from this Court that involved the meaning of § 27-14-22. In one recent case, Woodmen of theWorld Life Ins. Society v. Harris, 740 So.2d 362 (Ala. 1999), an insured made the same argument Crawford now makes regarding the effect of that Code section. However, this Court did not reach that argument in Harris, because it held that § 27-14-22
did not apply in cases involving fraternal benefit societies, such as the insurer in that case. In the only other case involving § 27-14-22,American Economy Ins. Co. v. Thompson, *Page 1136 643 So.2d 1350 (Ala. 1994), this Court relied on the language of that Code section in determining that Alabama law applied to the dispute between the parties in a choice-of-law situation where the issue was whether Alabama law or Mississippi law applied. In Thompson, then, this Court treated § 27-14-22 as a choice-of-law provision.
Section 27-14-22 was enacted as part of the Alabama Insurance Code, Act No. 407, Ala. Acts 1971 (Reg. Session). Earlier Codes of Alabama, however, had included similar provisions. See Title 28A, § 335, Ala. Code 1940 (Recomp. 1958); Title 28, § 10, Ala. Code 1940; § 8375, Ala. Code 1923; § 4583, Ala. Code 1907; and § 2606, Ala. Code 1896. This Court, in interpreting those earlier versions of the Code section that we are concerned with today, interpreted them in a manner consistent with Thompson. See, e.g., State Life Ins. Co. of Indianapolisv. Westcott, 166 Ala. 192, 52 So. 344 (1910), in which this Court held that the predecessor of § 27-14-22
superseded a contract provision that the law of Indiana would have applied. This Court held that the statute made the laws of Alabama applicable. In essence, this Court treated the Code section as a mandatory choice-of-law provision.
Even if we concluded that § 27-14-22 is more than a choice-of-law provision, that is, even if we accepted Crawford's incorporation argument, we would find American Bankers' argument persuasive. The heart of the controversy now before us is the question of arbitrability, a question arising from the presence of § 8-1-41(3). Viewing that Code section through the prism of § 27-14-22
would not alter the essential character of § 8-1-41(3). Assuming that Crawford's incorporation argument was persuasive, we would be faced with two competing federal policies. On the one hand would be the strong federal policy in favor of arbitration. See the FAA and Moses H.Cone Memorial Hosp. v. Mercury Construction Corp., 460 U.S. 1
(1983). On the other hand would be the strong federal policy favoring state regulation of insurance matters, a policy embodied in the McCarran-Ferguson Act. In light of all of the discussion set out above, we conclude that Crawford's incorporation argument is too attenuated to require the conclusion that the policy of the McCarran-Ferguson Act should take precedence over the federal policy in favor of arbitration. Our conclusion, then, is the same as that reached by Judge Albritton in White.
 CONCLUSION
We conclude that Crawford did agree to the arbitration endorsement included with his renewal packets and that he is bound by the terms of the arbitration clause in his contract of insurance. Consequently, we must hold that the trial court erred in denying arbitration on the basis that Crawford had not agreed to arbitrate his claims.
Further, we conclude that the anti-arbitration provision of §8-1-41(3), Ala. Code 1975, does not reverse-preempt the FAA under the provisions of the McCarran-Ferguson Act. Accordingly, we hold that the trial court also erred in denying arbitration on the basis of reverse preemption.
The trial court's order denying American Bankers' motion to compel arbitration is reversed, and this case is remanded with instructions for the trial court to enter an order compelling arbitration.
REVERSED AND REMANDED WITH INSTRUCTIONS.
Hooper, C.J., and See and Brown, JJ., concur.
Houston and Cook, JJ., concur in part and dissent in part.
Johnstone, J., dissents.
Lyons, J., recuses himself.
[1] An appeal is the proper method for challenging a trial court's order denying a motion to compel arbitration. A.G.Edwards Sons, Inc. v. Clark, 558 So.2d 358 (Ala. 1990). In contrast, the proper method for challenging a trial court's order granting a motion to compel arbitration is to petition for the writ of mandamus. Id.
[2] It appears undisputed that this case involves interstate commerce.